UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH MALONEY on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WATERMARK CONTRACTORS INC., KEVIN MAHER, and HUGH HARRIS,<br><br>Defendants. | Index No.: 1:21-cv-05727 (NSR) |

**DECLARATION OF BRETT R. GALLAWAY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARD**

Brett R. Gallaway, Esq., hereby declares under penalty of perjury as follows:

1. I am a partner at the law firm of McLaughlin & Stern, LLP ("M&S"), Class Counsel in this action. I respectfully submit this Declaration in support of the Parties' joint motion requesting the Court to: (i) grant final approval of the Joint Stipulation of Settlement and Release (the "Settlement Agreement"); (ii) approve Class Counsel's request for attorneys' fees in the amount of $166,666.66 and reimbursement of expenses in the amount of $11,491.66; (iii) approve fees to Arden Claims Service, LLC in the amount of $12,500.00 for services rendered in connection with Settlement Claims Administration; and (iv) approve service awards for the Named Plaintiff in the amount of $10,000. I am fully familiar with the facts and circumstances set forth herein.

I.    **The Litigation**

    A.    **Initial Investigation Efforts and Filing of Plaintiffs' Complaint**

2.    Defendants operate a construction and construction management business, which performs construction and related services on, *inter alia*, multifamily and residential projects, commercial and industrial construction projects and specialty healthcare projects.

3.    In early 2021, Class Counsel began investigating employee complaints about Watermark's compensation policies and practices.[1] After speaking with the Named Plaintiff, Class Counsel had individual telephone calls with several additional employees about their experiences at Watermark and reviewed a variety of time reports, paystubs, and other employee payroll records. These telephone calls and documents revealed that Watermark had apparently adopted an unlawful policy of not paying employees appropriate overtime compensation.

4.    After conducting extensive internet and legal research regarding Watermark's compensation policies, Class Counsel began drafting an initial Complaint, which they filed on July 1, 2021. Brought on behalf of hourly and non-exempt employees at Watermark, Plaintiffs filed their 18-page class and collective action complaint (the "Complaint") against Watermark in the United States District Court for the Southern District of New York, No. 21-cv-5727 (NSR), captioned *Maloney v. Watermark Contractors, Inc., et al.* In the Complaint, Plaintiff generally alleges that a number of Watermark's compensation policies and practices violated the Fair Labor Standards Act, codified at 29 U.S.C. §§ 201, *et. seq.* (the "FLSA") and New York Labor Law, Article 6 §§ 190, *et. seq.*, §§ 650, *et seq.*, and 12 NYCRR § 142-2.2 (the "NYLL").

5.    In principal part, the Complaint alleged that Watermark paid non-exempt hourly employees cash wages at their straight hourly rate for all hours worked in excess of 40 per week.

---

[1] Unless otherwise defined, capitalized terms shall have the same meaning as used in the Joint Stipulation of Settlement and Release (a/k/a the Settlement Agreement) (Dkt. No. 23-1).

6.      In drafting the Complaint, Class Counsel was necessarily mindful of the Second Circuit's decision in *Lundy v. Catholic Health System of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013).  Among other things, *Lundy* imposed a new level of "specificity" in pleadings asserting claims under the FLSA.  To comply with that heightened standard, the Complaint contains comprehensive and detailed allegations for the Named Plaintiff with regard to her hourly wages, job responsibilities, and uncompensated time.

        **B.**     **Early Mediation Related Discovery**

7.      On August 3, 2021, the Settling Entities filed their Answer. *See* Dkt. No. 15. Initially, Defendants wanted to limit the scope of the claims and discovery to the Named Plaintiff. However, Plaintiff was successful in convincing Defendants that this case would proceed on a class-wide basis and obtained voluminous time and payroll records for a representative sampling of 1/3 of the Class which were carefully reviewed and used to create a comprehensive damage analysis. Additionally, Class Counsel spoke with a number of Class Members regarding their work experiences at Watermark and secured three detailed declarations from Class Members attesting to and supporting Plaintiff's allegations in the Complaint.

        **C.**     **Settlement Negotiations & Mediation**

8.      Contemporaneous with these efforts in discovery and damage analysis, Class Counsel and counsel for the Settling Entities conferred and agreed to stay further discovery, including depositions, and engage a private mediator to explore settlement of the claims asserted in the Complaint. In furtherance of that agreement, counsel retained Martin Scheinman (the "Mediator"), an experienced and well-respected employment wage-and-hour mediator.

9.      In anticipation of mediation, Class Counsel consulted extensively with EmployStats, an economics and statistics expert, to assist in the calculation of Plaintiff's damages. Specifically, Class Counsel forwarded EmployStats thousands of time and payroll records received

from Watermark during the litigation. EmployStats then engaged in the extremely laborious and time-consuming task of "cleaning" those records through a statistical software program called STATA. STATA allowed EmployStats to present each employee's punch detail information in rows and columns from which it generated spreadsheets comparing the amount of time an employee was punched in during a particular day with the duration of the employee's shift. The difference in those figures multiplied by the employee's hourly or overtime rate of pay represented the employee's unpaid compensatory and overtime wages, which EmployStats calculated for each hourly employee for whom it had records.

10. Furthermore, Class Counsel drafted and submitted a comprehensive mediation statement to the Mediator outlining the claims in the Litigation, the risks associated with those claims, the viability of Watermark's defenses, and Plaintiff's damages.

11. An all-day mediation session was thereafter held on October 14, 2021, at which Class Counsel and counsel for Watermark reached agreement on the material terms of a settlement in the amount of $500,000. Over the next several weeks, the Parties negotiated the detailed Settlement Agreement and its accompanying exhibits.

12. The $500,000 Settlement Amount represents 21% of the $2,373,257 <u>maximum</u> damages Plaintiff and the Class could have secured had they succeeded on all their claims at trial, been awarded punitive damages over the 6-year NYLL statutory period, WTPA penalties for alleged NYLL § 195.1 and § 195.3 violations and full interest.

13. While this figure is, on its own, an excellent outcome in a complex class action of this nature, the result is even more impressive when viewed in relationship to the actual compensatory damages Class Members sustained in connection with the claims asserted in the action (*i.e.*, excluding liquidated damages and attorneys' fees and expenses). Specifically, the

$500,000 settlement fund represents 124% of the maximum compensatory damages sustained by Class Members as estimated by Plaintiff's damages expert, a truly outstanding outcome by any measure. The Plaintiff was contacted by Class Counsel and concurred with this assessment.

II.     **Settlement**

      A.     **Drafting and Execution of the Settlement Agreement**

14.     After the mediation, Class Counsel promptly began the task of drafting the Settlement Agreement and the accompanying Notice. The Court was advised of the proposed Settlement by letter dated November 16, 2021.

15.     Over the next several months, counsel for the parties exchanged multiple drafts of the Settlement Agreement and proposed Notice. Class Counsel also solicited bids for the claims administration process and ultimately selected Arden Claims Service, LLC ("Arden"), which submitted the most competitive and cost-effective bid and whom Class Counsel has worked with in connection with other class action settlements.

16.     Counsel worked expeditiously to finalize the settlement agreement and proposed Notice, including through a multitude of emails and telephone calls. That process was completed on November 8, 2021 when the Settlement Agreement was fully executed.

17.     On January 11, 2022, the Parties filed a comprehensive and detailed Joint Motion for Preliminary Approval of the Settlement (the "Motion for Preliminary Approval"). Subsequently, on March 10, 2022 the Hon. Nelson S. Roman issued an Order approving the Motion for Preliminary Approval and directing dissemination of the proposed Notice. The Court also set May 24, 2022 as the hearing date to consider granting final approval of the Settlement and Class Counsel's application for attorneys' fees and expenses and service awards to Named Plaintiff (the "Final Fairness Hearing").

B.	**Terms of the Settlement Agreement**

18.	Under the Settlement Agreement, the Settling Entities agreed to pay into the Qualified Settlement Fund the non-reversionary Gross Settlement Amount of $500,000.

19.	By November 13, 2021, Watermark deposited the 50% of the Gross Settlement Amount into the Qualified Settlement Fund and will deposit the remaining 50% within five days after the Court issues the Final Approval Order.

20.	From the Gross Settlement Amount will be deducted: (i) settlement administration fees, costs, and expenses, including but not limited to, Arden's fees and costs and costs of all notices; (ii) Court-approved attorneys' fees and costs for Class Counsel; (iii) Court-approved Service Award to the Named Plaintiffs; and (iv) a special reserve fund as described in Sections 1.27, 1.45, 3.1(F) and 3.4(B)(3) of the Settlement Agreement and discussed herein.  The amount remaining after these deductions, called the Net Settlement Fund, will be distributed to eligible Class Members.  The employers' share of payroll taxes shall be paid by the Settling Entities in addition to the Gross Settlement Amount.

21.	The Class Members will be paid their proportionate share of the Net Settlement Fund as determined by Arden based on the number of individual workweeks worked by each Class Members compared to the total amount of overall workweeks for all Class Members. Each Class Member will then be assigned a percentage of the Net Settlement Fund based on that calculation. The plan of allocation does not treat any Class Member better or worse than any other employee and, instead, is based entirely on objective mathematical calculations derived from time reports and pay records.

22.	More specifically, EmployStats created a computerized algorithm to determine each Class Member's individual damage award if the Litigation were to proceed to trial and if Class Counsel was successful in obtaining a full recovery for actual damages, liquidated damages,

statutory damages and interest (the "Full Recovery Amount"). For purposes of Settlement, each Class Member will be assigned an individual percentage amount of the Gross Settlement Amount based on the number of weeks they worked over the period between July 1, 2015 through March 10, 2022, divided by the number of total weeks worked by all class members over the same time period. Each Class Member's percentage amount of the Gross Settlement Amount shall be assigned to the Net Settlement Fund and in order to compute that Class Member's share of the Net Settlement Fund (an "Individual Settlement Amount"). For example, if a Class Member's percentage of the Full Recovery Amount is 1.00%, and the Net Distribution Amount is $300,000.00, then that Class Member's Individual Settlement Amount would be $3,000.00 (subject to the applicable tax withholdings).

23. This number can increase if one of several things happens. First, if any Class Member timely submits an Opt-out Statement, then the individual percentage amount of the Gross Settlement Amount for that Class Member will be evenly redistributed amongst all Opt-in Plaintiffs so the total of all Opt-in Plaintiffs' individual settlement amounts equals one hundred percent (100%) of the Net Settlement Fund. For example, if 50 Class Members submit timely Opt-out Statements and the total cumulative percentage of the Gross Settlement Amount for those 50 Class Members is 5%, then that 5% will be evenly redistributed amongst all Opt-in Plaintiffs, so that the Individual Settlement Amounts will equal one hundred percent (100%) of the Net Distribution Amount.

24. There is also a fund being set aside for disputed claims called the Reserve Fund. If some of that fund is remaining after a designated period of time, those monies will be distributed to members of the Settlement Class who have not requested exclusion. If there are any monies remaining from uncashed checks, that money will be transferred to one or more of the following

*cy pres* organization(s) as approved by the Court: (i) the Doe Fund; (ii) the Partnership for the Homeless; and/or (iii) any similar charitable organization that assists economically disadvantaged individuals in New York City in obtaining services, housing and/or employment opportunities.

25. A Class Member can dispute the Individual Settlement Amount if he or she believes there is an error.

26. To do so, the Class Member must provide written documentation to Arden establishing evidence contrary to the Settling Entities' time detail reports and payroll records. Arden shall resolve all disputes and have final decision with respect to any disputed claims. If a Class Member provides evidence to dispute their Individual Settlement Amount, Arden will recalculate that Class Member's Individual Settlement Amount and pay any additional money owed from the Reserve Fund.

27. Arden shall mail the Settlement Checks within thirty (30) days from when the Settlement becomes "Effective." The Settlement becomes Effective when, among other things, the Court finally approves the Settlement as fair and reasonable and the time for any appeal of that determination has expired.

28. The Settlement Agreement provides that members of the Class who do not request exclusion will release the Settling Entities and their related parties from all FLSA and New York wage-and-hour claims and causes of actions arising from the claims and factual allegations asserted, or which could have been asserted, in the litigation. The Settlement Agreement also requires that Named Plaintiff, in return for receiving service awards for her role in the litigation, will provide general releases in the Settling Entities' favor.

    **C.**    **The Class Notice**

29. Promptly after the Preliminary Approval Order was entered, Class Counsel, Watermark and Arden began working on finalizing the Class Notice. Moreover, as workweek

information for a majority of Class Members had not been produced, this information was collected and forwarded to Arden for analysis and input into its computer database.

30. The Notice was disseminated to Class on April 7, 2022. Among other things, the Notice contains relevant information about the nature of the lawsuit, including how the Individual Settlement Amounts will be calculated, attorneys' fees and expenses, the proposed service awards to the Named Plaintiff, and how Class Members can exclude themselves from the Settlement or object to the Settlement. The Notice also included information for Class Members who do not wish to participate in the Settlement.

31. To ensure Class Members can evaluate the merits of the Settlement and their projected recoveries, the Class Notice also contains each employee's Individual Settlement Amount based on a hypothetical Net Distribution Amount of $300,000 (that is, after deduction of requested attorneys' fees, expenses and administration costs). Those figures show compellingly the outstanding nature of the Settlement achieved in this case, as out of 144 Class Members, 72 Class Members can expect to receive between $100 and $999 from the Net Settlement Fund; 65 Class Members can expect to receive between $1,000 and $9,999 from the Net Settlement Fund, and 7 Class Members can expect to receive more than $10,000 from the Net Settlement Fund. Moreover, the average Class Member can expect to receive $2,078.76. Self-evidently, these are meaningful sums for Watermark employees, many of whom are low- or medium-income wage earners.

32. After dissemination of the Notice, at least 20-30 Class Members have telephoned M&S to inquire about the terms of the Settlement. M&S has devoted many hours responding to these calls, which continue as of the date of this Declaration.

### D. Objections to the Settlement

33. The date for objecting to the Settlement expired on May 7, 2022. Not a single Class Member objected to the Settlement or Class Counsel's fee request.

### E. Exclusion Requests

34. The date for requesting exclusion from the Settlement expired on May 7, 2022. Not a single Class Member requested to be excluded from the Settlement.

## III. Class Counsel's Request for Attorneys' Fees and Reimbursement of Expenses

### A. Time Expended by Class Counsel

35. For its services on behalf of the Class Members, Class Counsel ask the Court to approve an award of attorneys' fees in the sum of $166,666.66, representing one-third of the $500,000 Gross Settlement Amount. As described above, Class Counsel has litigated this case vigorously since inception on a fully contingent basis and expended its own funds for litigation expenses with no assurance those monies would ever be recovered.

36. Among the work performed by Class Counsel was the following:

- Extensive factual and legal research regarding Plaintiff's claims;

- Drafting a comprehensive Complaint;

- Communicating and negotiating with opposing counsel in connection with Watermark's efforts to limit the proposed class to just the Named Plaintiff and to compel the production of a representative sampling of class-wide discovery;

- Reviewing thousands of pages of documents from Watermark Class Member time and payroll records and detailed individual and corporate financial disclosures;

- Speaking with numerous Class Members regarding their employment experiences at Watermark, including almost 30 Class Members who have called to inquire about the

    Settlement after dissemination of the Notice – such inquiries continue through the filing of this motion;

- Regularly interacting with an expert in the wage and hour field to address and develop a variety of damage models;

- Engaging in multiple telephonic meet and confer sessions with Watermark's counsel regarding document productions, scheduling and other discovery issues;

- Preparing for and attending an all-day mediation session with Watermark and their counsel;

- Consulting with the Claims Administrator regarding the Notices and a number of administration issues; and

- Negotiating the Settlement, drafting the Settlement Agreement and motions for preliminary and final approval and communicating with Settlement Class Members regarding the Settlement.

  37. Needless to say, this matter has required M&S to expend substantial time that could have been spent on other cases. For the most part, there are three attorneys and one paralegal in the firm who work on wage and hour matters such as this. Work was frequently performed by such individuals on weekends, and, on many occasions, attorneys devoted entire days to the case either preparing for hearings, mediations, researching and drafting briefs, or taking interviews.

  38. Throughout the litigation, I oversaw assignments to attorneys and paralegals so the necessary work would be handled as efficiently as possible. The firm also sought to avoid duplication of effort by having one attorney take or defend interviews and attend hearings, except in instances where the presence of another attorney was necessary.

39. It is my firm's practice to maintain contemporaneous time records setting forth the amount of time spent on each task and each case, and with explanatory statements regarding the actual task involved. My usual practice, and the usual practice of the other attorneys in my firm, is to record on daily time logs only those hours that my firm would customarily bill to a commercial client paying on an hourly basis. The time logs for this matter (including all billers) have been carefully reviewed for accuracy and completeness. If the Court requests, M&S will submit its time records in the matter for the Court's review.

40. My current hourly rate is $650 per hour. I have charged a $750 rate to hourly paying clients in other cases, including defending similar wage and hour actions brought in the United States District Court for the Southern District of New York. I graduated from law school in 2011 and have been practicing class action litigation since that date with a primary focus on wage and hour class actions. In connection with these matters, I have been lead or co-lead counsel in approximately one dozen large class actions and have helped secure tens of millions of dollars in compensation for workers nationwide.

41. The current hourly rates of others within my firm who spent meaningful time litigating this action are: Lee S. Shalov (billable rate $750 per hour) and Jason S. Giaimo (billable rate $485 per hour). Mr. Shalov is co-chair of M&S' class action practice and a 1984 law school graduate and Mr. Giaimo is a 2014 law school graduate. Both Mr. Shalov and Mr. Giaimo practice wage and hour litigation at M&S. The firm biographies of the principal attorneys who worked on this case are attached hereto as **Exhibit A**.

42. Based on my experience in class actions over the last ten years, I have personal knowledge of the hourly rates charged by other attorneys with comparable experience as well as the attorneys within the firm who worked on this matter. Based on that information, I believe these

rates are fully consistent with the market rate in New York for attorneys with comparable expertise, experience and qualifications, and are comparable to rates of attorneys specializing in complex litigation around the country. Thus, I believe the rates charged by M&S for its partner and non-partner attorney time are reasonable and appropriate fees for those with comparable expertise, experience and qualifications.

43. As of May 9, 2022, my firm expended over 144 hours on this matter, with work still continuing, including telephone calls with Class Members and handling claims administration issues. Attached hereto as **Exhibit B** is a true and correct summary by individual of the hours, billing rate, and lodestar for each biller's work on this matter through that date.

44. The lodestar of M&S is $75,675.00. This amounts to a 2.2 multiple of the fee requested by Class Counsel.

B. **Expenses Incurred By Class Counsel**

45. M&S requests reimbursement of $11,491.66 in total expenses incurred in connection with this litigation and costs for Arden for claims administration services in the amount of $12,500 to be paid from the Gross Settlement Amount. *See* **Exhibit C**.

46. A substantial portion of these expenses (totaling $5,125.00) was associated with the expert fees of EmployStats, which spent many hours creating a sophisticated computer database, reviewing and analyzing thousands of pages of employee wage records, and communicating with Class Counsel regarding damages models and the Class Notice. Additionally, there were $5,700.00 in fees charged by Martin Scheinman in connection with his services during the all-day mediation session that resulted in the Settlement. The remaining expenses are associated with copying, postage, faxing, and filing fees.

## IV. The Service Award

47. The Named Plaintiff requests a service award of $10,000 for her efforts throughout this litigation. The efforts of the Named Plaintiff were substantial and invaluable.

48. Specifically, the Named Plaintiff was in constant communication with my firm from the beginning of the case until its resolution. She provided the details of her work experiences at Watermark in connection with drafting of the Complaint, which she reviewed. And she participated in the settlement process and communicated with Class Counsel to convey her approval of the Settlement.

49. Named Plaintiff undertook these efforts without any assurance she would be compensated for her time. Moreover, the Named Plaintiff is still in the job market and assumed significant risk in lending her name to this lawsuit.

For the foregoing reasons, Class Counsel respectfully requests that the Court: (i) grant final approval of the Settlement; (ii) approve Class Counsel's request for attorneys' fees in the amount of $166,666.66 and reimbursement of expenses in the amount of $11,491.66; (iii) approve fees to Arden in the amount of $12,500 for services rendered in connection with Settlement Claims Administration; and (iv) approve a service award for the Named Plaintiff in the amount of $10,000.

Dated: New York, New York
       May 9, 2022

                                                            _____
                                                            Brett R. Gallaway